1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          CENTRAL DISTRICT OF CALIFORNIA
10   GEORGE ROBERT HUFF, MARIA H. )      2:07-cv-04114-FMC-AJWx
     HUFF, AND VINCENT HUFF,      )
11                                )
12                 Plaintiff(s),  )      FINDINGS   OF   FACT   AND
                                  )      CONCLUSIONS OF LAW
13   vs.                          )
14                                )
15   CITY OF BURBANK,             )
     BELLARMINE-JEFFERSON HIGH    )
16   SCHOOL, ALEX SEPANOSSIAN,    )
     DARIN RYBURN, EDMUNDO        )
17   ZEPADA, CHRIS ROBARTS,       )
     FERNANDO MUNOZ,              )
18                                )
                   Defendant(s).  )
19   _____)

20          The matter came on for trial before the Court sitting without a jury, on

21   January 13 and January 14, 2009.  Following the presentation of evidence and

22   argument, the matter was taken under submission.  The Court now makes the

23   following findings of fact and reaches the following conclusions of law.

24

25                        **Findings of Fact**

26          1.   On June 1, 2007, four officers of the Burbank Police Department

27   (defendants Chris Robarts, Fernando Munoz, Edmundo Zepeda, and Darin Ryburn)

28   responded to a call from Bellarmine-Jefferson High School.

2.  At the high school, they learned that there was a rumor circulating at the school that a letter had been written by plaintiff, Vincent Huff, (a student at the school) in which he had threatened to shoot up the school.

3.  After interviewing the school principal and two students, they learned that Vincent was a student who had been subjected to bullying, that he had been absent from school for two days, and that many parents had heard about the letter and had kept their children at home.

4.  The officers went to the plaintiffs' home to interview the family and continue their investigation.

5.  On arrival at the home, Zepeda knocked on the door and announced, several times, that they were with the Burbank Police Department.  No one responded.

6.  Ryburn then called the home phone number.  Although the officers could hear the telephone ringing inside the house, there was no answer.

7.  Ryburn then called Mrs. Huff on her cell phone.  She answered the phone. Ryburn identified himself and asked her where she was.  She said she was in her house.  He asked where Vincent was, and she responded that he was with her. Ryburn told her they were outside her house and wanted to talk to her.  She hung up the phone.

8.  One or two minutes later, Mrs. Huff and Vincent came out of the house and stood on the steps.

9.  Zepeda spoke to Vincent and told him they were there to talk about some threats at the school.  Vincent responded, "I can't believe you're here for that."

10.  Ryburn approached Mrs. Huff and asked if they could go inside the house to talk.  She said, "No."

11.  Juvenile Officers always offer to conduct their interviews inside to protect the privacy of the minors.  It is extremely unusual to have a parent refuse entry.

12.  He asked if there were any guns in the house.  Mrs. Huff immediately

1    turned around and ran into the house.

2        13.  Ryburn followed Mrs. Huff into the house.  Vincent then entered the
3    residence, followed by Zepeda.  Zepeda entered the residence because of "officer
4    safety" concerns.  Because of the report concerning threats to shoot, he did not want
5    his fellow officer to enter the house alone.

6        14.  Munoz and Robarts had been standing back near the sidewalk.  They
7    could see that Ryburn and Zepeda were talking to the two plaintiffs, but could not
8    hear their conversation.

9        15.  After Ryburn and Zepeda went into the house, Munoz and Robarts, who
10   assumed plaintiffs had given their consent, entered the home.

11       16.  After the officers entered the house, they remained in the living room with
12   Mrs. Huff and Vincent.

13       17.  Mr. Huff entered the room and challenged the authority of the officers to
14   be in his home.

15       18.  The officers remained inside the home for five to ten minutes, talking to
16   Mr. Huff and Vincent.  Ultimately, they satisfied themselves that the rumors about
17   threats were a hoax.  They left the home and returned to the school to report their
18   conclusions.

19       19.  During the time they were inside the residence, they conducted no search
20   of any persons or property.

21

22                              **Conclusions of Law**

23       All four individual defendants are entitled to qualified immunity for their
24   actions in this case.  Although a constitutional violation occurred (the officers made
25   a warrantless entry into plaintiffs' home), "qualified immunity shields an officer
26   from suit when she makes a decision that, even if constitutionally deficient,
27   reasonably misapprehends the law governing the circumstances she confronted."
28   *Brousseau v. Haugen,* 543 U.S. 194, 198 (2004). The analysis is an objective one:

1    whether a reasonable officer could have believed the warrantless entry was lawful.

2    *Anderson v. Creighton,* 483 U.S. 635, 641,  107 S.Ct. 3034 (1987).

3         Therefore, the inquiry here is not whether an unconsented to, warrantless entry

4    into a residence violates the Fourth Amendment.  Rather, it is whether, in light of

5    existing law, the unlawfulness of the particular entry was apparent. *Malley v. Briggs,*

6    475 U.S. 335, 341, 106 S.Ct. 1092 (1986).

7         The Supreme Court explained in *Anderson*, 483 U.S. at 641:

8              We have recognized that it is inevitable that law enforcement

9              officials will in some cases reasonably but mistakenly conclude

10             that probable cause is present, and we have indicated that in such

11             cases those officials - like other officials who act in ways they

12             reasonably believe to be lawful - should not be held personally

13             liable. [citation].  The same is true of their conclusions regarding

14             exigent circumstances....[¶] [T]he determination whether it was

15             objectively legally reasonable to conclude that a given search

16             was supported by probable cause or exigent circumstances will

17             often require examination of the information possessed by the

18             searching officials.... The relevant question in this case, for

19             example, is the objective (albeit fact-specific) question whether

20             a reasonable officer could have believed Anderson's warrantless

21             search to be lawful, in light of clearly established law and the

22             information the searching officers possessed."

23   *Anderson*, 483 U.S. at 641.

24        An exception to the warrant requirement is the existence of exigent

25   circumstances.   An exigency is generally found to exist in cases "in which a

26   substantial risk of harm to the persons involved or to the law enforcement process

27   would arise if the police were to delay a search [or arrest] until a warrant could be

28   obtained."  *United States v. Al-Azzawy*, 784 F.2d. 890, 894 (9thCir. 1986). In *Al-*

4

*Azzawy,* the Ninth Circuit concluded that the existence of an exigency turned on whether the officers "reasonably believed" that there was a substantial risk of harm at the time of their entry. *Id.* at 894.

Here, the officers testified that a number of factors led them to be concerned for their own safety and for the safety of other persons in the residence: the unusual behavior of the parents in not answering the door or the telephone; the fact that Mrs. Huff did not inquire about the reason for their visit or express concern that they were investigating her son; the fact that she hung up the telephone on the officer; the fact that she refused to tell them whether there were guns in the house; and finally, the fact that she ran back into the house while being questioned. That behavior, combined with the information obtained at the school -- that Vincent was a student who was a victim of bullying, who had been absent from school for two days, and who had threatened to "shoot up" the school -- led the officers to believe that there could be weapons inside the house, and that family members or the officers themselves were in danger.

The Court holds that the officers' conclusions were objectively reasonable. Within a very short period of time, the officers were confronted with facts and circumstances giving rise to grave concern about the nature of the danger they were confronting. This was a rapidly evolving incident, in which case there should be a far greater reluctance to fault the police for not obtaining a warrant. *See United States v. Tarazon,* 989 F.2d 1045 (9th Cir. 1993); *Laaman v. United States,* 973 F.2d. 107 (2d Cir. 1992).

/      /      /

/      /      /

/      /      /

/      /      /

/      /      /

/      /      /

5

1

**Verdict**

2    **Judgment in favor of defendants and against plaintiffs.**

3

4        Counsel for defendants is directed to provide a Judgment for the Court's

5    signature.

6

7        Dated this 16th day of January 2009.

8

9    _____

10   FLORENCE-MARIE COOPER
     United States District Court Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28